### In re POMERANTZ & HOPKINS.

(District Court, E. D. Pennsylvania. February 25, 1909.)

#### No. 2,895.

BANKRUPTCY (§ 409*)—GROUNDS FOR REFUSAL OF DISCHARGE—FAILURE TO KEEP
BOOKS OF ACCOUNT.

That a partnership conducting a retail store made no entry in the books
of the business of indebtedness for money borrowed from various persons,
mostly relatives of the partners, aggregating about $3,000, a record of
which loans was kept only in a private memorandum book carried by one
of the partners, and the result being that a statement furnished to a mer-
cantile agency as a basis for credit, made up by the bookkeeper from the
books, did not disclose such indebtedness, justified a finding that the part-
ners, "with intent to conceal their financial condition, destroyed, concealed,
or failed to keep books of account or records from which such condition
might be ascertained," and a denial of their discharge under Bankr. Act
July 1, 1898, c. 541, § 14b (2), 30 Stat. 550 (U. S. Comp. St. 1901, p. 3427),
as amended by Act Feb. 5, 1903, c. 487, § 4, 32 Stat. 797 (U. S. Comp. St.
Supp. 1907, p. 1026).

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 409.*]

In Bankruptcy. On certificate of referee recommending refusal of
discharge.

The following is the report of Edward F. Hoffman, referee, on ob-
jections to the discharge of the bankrupts:

To the Honorable the Judges of the District Court:

I respectfully report that the specifications of objections to the bankrupts'
discharge are brought under clauses 2 and 3, § 14, par. 3, of the bankruptcy
act of July 1, 1898, c. 541, 30 Stat. 550 (U. S. Comp. St. 1901, p. 3427), as amend-
ed by Act Feb. 5, 1903, c. 487, § 4, 32 Stat. 797 (U. S. Comp. St. Supp. 1907, p.
1026), which provides for a discharge unless the bankrupt, "(2) with intent to
conceal his financial condition, destroyed, concealed or failed to keep books of
account or records from which such condition might be ascertained; (3) or ob-
tained property on credit from any person upon a materially false statement
in writing, made to such person for the purpose of obtaining such property on
credit."

Before entering into details, I will state briefly that the statement upon
which a credit was obtained was a financial statement made to Dun's Agency,
and by said agency transmitted to the American Woolen Company, the object-
ing creditor.

It appears from the examination of the bankrupts that they had a loan ac-
count with various individuals aggregating some $3,000, which did not appear
upon the regular books of the firm in the custody of the bookkeeper, a memo-
randum of the said loans being kept in a small book carried on the person of
Harris Pomerantz, one of the bankrupts.

From this it results that the statement prepared for the mercantile agency
by the bookkeeper, and signed by the firm through one of the partners, did not
truthfully disclose the loan account of the bankrupts, and that the books of
the bankrupts as kept by the bookkeeper did not show these loans, giving rise
to the second exception, under which it is contended that the small memoran-
dum book cannot be treated as a firm book.

As the objection first urged was that of having obtained credit by means of
a false statement, I will consider this first, and find upon the facts as well as
the law.

A full copy of the financial statement is to be found on page 251 of the tes-
timony. The falsity of the statement is in the item of loan account. The
statement places loans due others than bank $598, whereas in point of fact

there were loans aggregating some $3,000, due some eight or more people, relatives or connections of the bankrupts, in the following amounts:

| | | | | | | |
|---|---|---|---|---|---|---|
| H. Rudnick, | page 2. | October | 24, | 1907 | ................. | $650 00 |
| Barney Davis, | " 4. | " | 24, | " | ................. | 680 00 |
| A. Einstein, | " 3. | " | 28, | " | ................. | 150 00 |
| Victor Clements, | " 4. | " | 28, | " | ................. | 250 00 |
| L. Sassman, | " 4. | " | 28, | " | ................. | 401 55 |
| Samuel Tolchinsky, | " 5. | " | 28, | " | ................. | 350 00 |
| William Hopkins, | " 6. | " | 28, | " | ................. | 375 00 |
| Samuel Goldberg, | " 3. | " | 1, | " | ................. | 400 00 |

It cannot be disputed that this statement was materially false, as the bankrupt himself testified that all the amounts mentioned above were debts due by the firm, and the said amounts were duly proven against the bankrupts' estate after a contest.

The statement is signed "Pomerantz & Hopkins, by Harris Pomerantz." The existence of the firm is admitted, also the signature, and I do not think it can be questioned that both partners are bound by the signature of a copartner to this statement, both having received the benefit derived therefrom. In re A. F. Hardie & Co. (D. C.) 16 Am. Bankr. Rep. 313, 143 Fed. 607.

It appears from the testimony that Pomerantz & Hopkins were in the tailoring business, and had for some years prior to the bankruptcy been customers of the American Woolen Company, the objecting creditor. They were also subscribers to Dun's Agency, and had made several statements to Dun's Agency prior to the statement in question made in January, 1907.

It appears from the testimony of Mr. Charles V. Winder (page 250), one of the credit men of Dun's Agency, that he visited Pomerantz & Hopkins in Philadelphia, and on the 10th of January, 1907, procured the financial statement in question. He also testified that this report was made to establish a rating of credit in reference to inquiries from their New York office.

Edward R. MacElrath, credit man for the American Woolen Company, testified (page 259) that he procured this statement in question from Dun's Agency, and on the strength of the statement, on or about February 5, 1907, within a few days after receiving it, made a line of credit and delivered goods to the bankrupts.

From the foregoing I summarize my findings of fact as follows:

I find that the American Woolen Company, a creditor, procured from Pomerantz & Hopkins, the bankrupts, through R. G. Dun & Co., mercantile agency, a financial statement of said firm of Pomerantz & Hopkins, duly signed by the said firm, which said statement was materially false in the item of loan account, in amount approximating $3,000. This statement was procured at the instance of the American Woolen Company on or about the 10th of January, 1907, and received by them on or before the 5th of February, 1907, and on or about that date acted upon by them in the way of allowing credit and delivering goods on the strength of said statement; that, at the time of making the statement to the mercantile agency, Pomerantz & Hopkins were subscribers to Dun's Agency and must have known the purposes for which statements were procured, but had no knowledge that the statement was procured at the instance of the American Woolen Company, the objecting creditor.

It would appear, therefore, that the falsity of the statement is material, and that it was promptly acted upon in the way of allowance of credit and delivery of goods by the objecting creditor.

The only defense that can be considered is that the statement was not made by the bankrupts directly to the party from whom the goods were obtained, or with knowledge that it was to be transmitted to any particular person at any particular time.

It raises a question that has never been squarely decided, whether a false financial statement made to a mercantile agency, and promptly acted upon in the way of allowing credit and delivering goods by a person receiving a statement from the agency, enables the person who received the statement to file objections to the discharge in bankruptcy of the person who makes it to the agency, under the provisions of section 3 of the bankruptcy act, the subject of this specification of objection.

While there is no direct decision on the question, I am of opinion that the dicta of the judges in the cases I have found on the subject establish that where the report of the mercantile agency is obtained at the instance of the creditor who delivers goods on the strength of it, and is promptly acted upon, it comes within the provisions of section 3.

In the case of In re A. B. Carton & Co. (D. C.) 17 Am. Bankr. Rep. 353, 148 Fed. 63, the question of a false report to Dun's Agency was before the consideration of the court. It appears that Faulkner & Co., creditors, alleged that they had delivered goods on the strength of a false statement made by the bankrupts to Dun's Agency and transmitted to them. The master dismissed this specification of objection, but allowed the same objecting creditors to prove delivery of goods by another creditor under a false statement made by the bankrupts directly to said creditor.

As far as the decision of the master in this case is concerned, it is directly adverse to the contention of the objecting creditor in the case in hand, but in commenting on the decision of the master on review, Judge Hough says:

"The question raised by the first of the above-noted findings of the commissioner is interesting, but it appears to me (in this case) wholly academic. It has never been decided whether under any circumstances a false statement contained in a report to a commercial agency can be made the ground of successful objection to discharge. The considerations advanced in Re Dresser & Co. (D. C.) 13 Am. Bankr. Rep. 619, 620, 144 Fed. 318, are entitled to great weight, and, in my opinion, show that the usual commercial agency report obtained by an agency in order that it may give the new merchant a 'rating,' and for general distribution among its customers, cannot be made the basis of successful action by an objecting creditor.

"If, however, such a report as is here shown be obtained from a merchant by a commercial agency at the request, disclosed or undisclosed, of one or more of the agency's customers, it seems to me incredible that the merchant furnishing such report can be supposed to have given it for any other purpose than of enlightening those persons who habitually deal with him on credit as to his true financial condition. The custom of trade is so well known that, when an agency applies to a merchant for a specially signed report on his condition, he must know that such report is for the special purpose of enabling those who usually send him goods to decide upon his financial responsibility.

"The testimony in this case leaves me in doubt whether the report produced by Faulkner, Page & Co. was a 'special report' or not, or whether it was obtained at the instance or request of Faulkner, Page & Co. or any other creditor or customer of the bankrupts. If the report were obtained upon special request, I fail to see why the doctrine of Mills v. Brill, 105 App. Div. 389, 94 N. Y. Supp. 163, cited in 16 Am. Bankr. Rep. 740, note, and Eaton v. Avery, 83 N. Y. 31, 38 Am. Rep. 389, should not apply. It cannot be that a merchant may in bankruptcy avoid the consequences of making false statements by always making them to a commercial agency, even though such agency specially request him to tell the truth for a special purpose.

"This specification the commissioner has overruled, but inasmuch as he has refused the discharge on other grounds, the discussion, though interesting, is not at present material."

On this dictum it would appear as if Judge Hough would sustain objections to the discharge where the report of the commercial agency was obtained at the request of the creditor obtaining it.

In the case referred to it is held: "A person furnishing information to such agency in relation to his own circumstances, means, and pecuniary responsibility can have no other motive in so doing than to enable the agency to communicate such information to persons who may be interested in obtaining it for their guidance in giving credit to the party; and if a merchant furnishes to such an agency a willfully false statement of his circumstances or pecuniary ability, with intent to obtain a standing and credit to which he knows that he is not justly entitled, and thus to defraud whoever may resort to the agency, and in reliance upon the false information there lodged extend a credit to him, there is no reason why his liability to any party defrauded by those

means should not be the same as if he had made the false representation directly to the party injured."

On behalf of the bankrupts, it is urged that the textbooks cast doubt as to the applicability of this section to financial statements made to agencies, and cite the original clause of the "Ray Amendment," showing that portions of the original clause that would clearly include statements to a commercial agency were struck out on amendment, thus reasoning that the intention of the Legislature was to so word the clause in question that it would not include statements made to commercial agencies. This appears to me to be a dangerous method of construing legislation. Penal acts must be considered strictly, and principles of law applied to the language actually used in the act, without going into questions as to what was intended by the Legislature on account of changes made in the language of the act in passing the legislation.

I would remark, however, that there is sufficient left to support the dictum of Judge Hough, and the clauses struck out in amendment were so inclusive that many statements of financial condition outside of such statements made to commercial agencies would have come within the provision of the clause before it was amended by Congress. A statement made to a credit agency is for the purpose of divulging the same to any person interested in procuring it, and the party giving the statement must be presumed to know it is for this purpose, and to have constituted the agency as his agent for the purpose of giving this information to those asking for it, and the offense of making a false statement for general communication is really greater than that of making it directly to one person. The dictum of Judge Hough appears to be a judicial construction of the act, and I do not find an adverse decision. Of course, a statement procured from a mercantile agency must be scrutinized closely, and is subject to defenses that would not apply to a statement made directly from the purchaser to the vendor; but where the purchaser is a subscriber to the agency, and the statement is materially false, and procured by a creditor for the purpose of passing upon credit, and promptly acted upon, I am of opinion that the transaction comes within the terms of clause "(3) obtaining property on credit from any person upon a materially false statement in writing made to such person for the purpose of obtaining such property on credit."

For these reasons, this specification of objection is sustained.

The second exception is that the bankrupts, "with intent to conceal their financial condition, destroyed, concealed, or failed to keep books of account or records from which such condition might be ascertained."

In my finding upon the first exception I have enumerated the accounts that were not entered in the books of the firm, kept by the bookkeeper, with the exception of a small portion of the money received from said loans that was left with the bookkeeper, hereinafter alluded to.

The fact that this statement signed by the firm and transmitted to Dun's Agency, which only stated a small fraction of the amount covered by the loans, reveals the motive for keeping these accounts from the office books of the firm and the knowledge of the bookkeeper.

As is well stated by the master, and affirmed by the judges, in the case of In re Breuer, 20 Am. Bankr. Rep. 645, 166 Fed. 930: "It is a notorious fact, of which I think the court may take judicial cognizance, that intending vendors of merchandise are peculiarly sensitive to debts for borrowed money; they are apt to look into them with a microscopic eye; they induce suspicion of themselves, and very justly so; for it is a matter of common knowledge that such liabilities are earliest discharged if the creditors are relatives by blood or marriage, when doubt arises as to ability to pay all creditors."

I have carefully read and considered all the testimony in the case, and it is evident to my mind that the loans obtained from relatives and connections—some eight in number—were purposely not communicated to the bookkeeper and not entered on the office books of the firm. If it had come to the knowledge of the houses from whom they made their purchases that such transactions had taken place, their credit would have instantly been stopped.

The vest pocket book that contained these items of the loan account was not produced or mentioned until the examination of the bankrupts on behalf

of the trustee in bankruptcy. It is first referred to on page 13 of the testimony:

"Q. How much do you owe Mr. Rudnick now? A. I do not know until I refer to my book. Q. What book do you have to refer to? A. Book that I marked in taking the money. I have a little book here. Q. At the time you took the money for your business you made an entry in that little book? A. Yes. Q. Have you that little book with you? A. Yes, sir. (Book produced and marked 'Exhibit A'.) Q. (page 14). In making up your statement for the mercantile agency, did you include this $650 owed by you? A. No, sir. Q. You did not? Then when you stated you owed $9,982.84 on the 8th day of January, 1907, you did not include this $650? A. I do not know, because this was loaned temporarily."

Next, as to the loan of Barney Davis, he testifies:

"Q. Now, this $380 of this money was loaned to you before January 8, 1907, was it not? A. Yes, sir. Q. They were owed by you on that day? A. Yes. Q. Did you, in counting up your loans of indebtedness, include this $380? A. I did not. Q. You did not? A. No. Q. Did this entry appear upon any of your other books? A. I do not know. Q. Do you know whether or not you told the bookkeeper of any of these loans? A. I do not know just what appeared in the books. Q. Your bookkeeper made a statement from the books? A. Yes. Q. Then your bookkeeper would not have had any record from which to get this $380? A. I do not know. Some money was taken, and I told the bookkeeper I just borrowed it for a short time."

On page 17 it appears from the testimony of Mr. Hopkins that he knew Pomerantz was borrowing money, and that the financial statement had been made by the bookkeeper to the mercantile agency.

On page 17 Pomerantz was examined as to the Rudnick loan, and it was shown that $200 of the loan appeared in the ledger. He is asked the question:

"Q. Will you tell us why in making up that book in January, 1907, when that book was started, you did not put in the entry of the $450 loan? A. Because he had my note for it. Q. Will you please state why this $450 is not on the book? A. I took it for only a short time. Q. Why did you put the $200 in the book and not the $450? A. The $450 was taken for a short-time loan."

On page 24 Pomerantz is asked the following question by the referee:

"Q. Where was that little book kept? A. In my purse in my pocket."

On page 33 Pomerantz was asked why a loan of $300 had been put on his books. He made answer: "Because it was brought to the place and given to the bookkeeper." He was asked the question:

"Q. And don't your books show the payment of every dollar of expenses you had at that time? A. The books show whenever I told the bookkeeper about it. I did not tell the bookkeeper sometimes."

The testimony shows that of the people who made these loans Rudnick is the second or third cousin of Pomerantz, Barney Davis is a brother-in-law, Samuel Goldberg is a brother-in-law of Hopkins, Einstein a cousin, V. C. Clements a cousin, Hopkins, of Hopkins & Milgraum, a brother, and L. Sassman a brother-in-law. All these loans appear to have been in cash, without interest, and the facts attending the loan were so unusual that a contest was made of each claim, and a large amount of the record hereto attached is taken up of testimony with reference to these claims, which, being sustained by the testimony of the bankrupts and the claimants, could not be resisted.

The testimony of the bankrupts is very evasive, and the whole record full of "I don't know" and "I don't remember" answers.

On page 53 it appears from the testimony of Pomerantz that there was still another little book, and that the entries in the little book he produced were some of them transferred from another little book:

"Q. All these entries were made the day you borrowed the money? Were they not? A. In this book? Q. In the little book? A. It was entered in another book, and I transferred to this book. Q. Then this is not the book in which you first made the entries of the loans? A. Some is. I had another memorandum book and entered them there. Q. Will you please tell me how it happened on the same page you got, 'H. Davis, November 14th, 1906, $300,' and under that you got, 'Jacob Davis, October 16, 1906, $300'? A. It is a different entry. Borrowed of J. Davis and paid him. Q. How is it you got

entry of H. Davis before J. Davis, when J. Davis' loan was a month earlier? A. I do not understand your question."

On page 54 he testifies that, when he started the little book he was testifying from, he destroyed the former little book.

On page 57, when his attention is called to the fact that the loans were not entered in chronological order in the little book, he was asked the question:

"Q. Is it not a fact you have entered A. Eisenstein, February 20, 1906, $500? Then you have a loan, L. Epstein, November 25, 1906, $150. Now, when that entry of Epstein was put here, you owed Eisenstein $500 or $650? A. I do not know. Q. Look at your book and see. A. Mr. Mayer, I do not know about the months. I forget. I do not know when September comes first, or when it comes exactly. Q. You do not mean to tell us you do not know whether November or May is earlier in the year? A. That I could not say."

On page 78 I cite the following from the examination:

By the referee:

"Q. As I understand it, you borrowed about $4,000 for which you gave your notes. That is about right on these loans? A. Yes. Q. These loans were made to you by some ten different people? A. Yes. Q. Did they give you money in bank notes, or checks, and in what figures did they give you the money? A. Cash, paper money, and bank bills."

A full account of the method of making the loan is given on pages 78 to 80. On page 85 it appears that some of the holders of notes received goods from the store that were not charged, in view of interest; that Eisenstein got some suits, and Sassman got some suits. It does not seem necessary to cite further from the testimony.

I am of opinion that the vest pocket book, which in fact seems to have been copied from another vest pocket book, destroyed, which was not produced until the bankrupt was produced for examination before the referee, cannot be considered as a book of the firm. The transactions contained in this little book are of a very questionable character, and the motive for concealing these demand loans from any person who might possibly divulge them to the trade is obvious.

Since the Ray amendment, the word "fraudulent" having been struck out from the clause in question, it is only necessary to show an intent to conceal.

The conclusion is irresistible from the fact of these loans being omitted from the financial statement and from the regular books that they were secret transactions and intended to be withheld from the parties from whom they purchased, and therefore, the specifications of objection under clause 2, that the bankrupt, "with intent to conceal his financial condition, destroyed, concealed or failed to keep books of account or records from which such condition might be ascertained," is sustained.

Charles H. Edmunds, for bankrupts.
Clinton O. Mayer and Irwin L. Sessler, for objecting creditor.

J. B. McPHERSON, District Judge. It is not necessary to consider the question whether a materially false statement made by a debtor to a mercantile agency should be regarded as made to his creditors in general or to a specified creditor in particular, so as to fall within the class of false statements described in section 14b (3) of the bankruptcy act of July 1, 1898, c. 541, 30 Stat. 550 (U. S. Comp. St. 1901, p. 3427), as amended by Act Feb. 5, 1903, c. 487, § 4, 32 Stat. 797 (U. S. Comp. St. Supp. 1907, p. 1026), since in my opinion, the discharge was properly refused upon the other ground referred to in the specifications of objection. I have read and considered the voluminous testimony taken by the referee, and agree that the facts found by him are well supported by the evidence, and that the discharge should be refused on the ground set forth in section 14b (2) namely, that the bankrupts,

"with intent to conceal (their) financial condition, destroyed, concealed, or failed to keep, books of account of records from which such condition might be ascertained."

For this reason the discharge is refused.